**In re DEUPREE FOOD SYSTEMS, INC., Debtor.**

**FIRST ALABAMA BANK, Plaintiff,**

v.

**DEUPREE FOOD SYSTEMS, INC., James L. Deupree, Horton Construction Co., Inc., and Michael T. Horton, Defendants.**

**Bankruptcy No. 88–00754.**
**Adv. No. 88–0093.**

United States Bankruptcy Court, N.D. Alabama.

Dec. 30, 1988.

Thomas J. Knight and Cleophus Thomas, Anniston, Ala., for Deupree Food Systems, debtor.

Ralph D. Gaines, III, Talladega, Ala., for Horton Const. Co., Inc., and Michael T. Horton.

O.S. Thornton, Talladega, Ala., for First Alabama Bank.

Charles Miller, for N.C.R.

**STATEMENT OF THE PROCEEDING, FINDINGS OF FACT, AND CONCLUSIONS BY THE COURT**

L. CHANDLER WATSON, Jr., Bankruptcy Judge.

*Statement of the Proceeding —*

The above-styled case was commenced January 26, 1988, and is pending before this Court under title 11, chapter 11, United States Code, with no trustee having been appointed. The above-styled adversary proceeding is related to said case and has been pending before this Court since its removal to this Court pursuant to *"NOTICE OF REMOVAL"* and *"APPLICATION FOR REMOVAL"* by defendant Deupree Food Systems, Inc. (hereinafter

referred to as "debtor"), dated and filed in this Court on February 16, 1988.

There is no dispute between any of the parties as to the procedural events which have occurred in this litigation, and the Court takes judicial notice of those stated above and subsequently. This litigation was originally commenced as a civil action, upon a complaint filed by the plaintiff, First Alabama Bank (hereinafter referred to as "bank") in the Circuit Court of Talladega, Alabama, on October 24, 1986; wherein, Horton Construction Company, Inc. (hereinafter referred to as "H. Const."), Michael T. Horton (hereinafter referred to as "Horton"), James L. (Skip) Deupree, Jr. (hereinafter referred to as "Deupree"), and the debtor were named as defendants. The main thrust of the bank's litigation was to interplead the sum of $10,000.00 (paid by the bank to the register of the state court); however, the bank asserted a claim for its attorney's fees in the civil action and, also, asserted a counterclaim or setoff of $3,022.00 against H. Const. and Horton.

On February 3, 1988, NCR Corporation (hereinafter referred to as "NCR") filed in said state court a motion to intervene in the interpleader action commenced by the bank; and, on March 3, 1988, the Honorable William C. Sullivan, judge of said circuit court, purported to enter an order granting the request of NCR to be constituted as an intervenor in the interpleader action. With its motion to intervene, NCR filed a motion for summary judgment in its favor, which, apparently, has not been brought on for a hearing in the state court or this Court.

On March 25, 1988, the bankruptcy court entered an order in this adversary proceeding, which directed the debtor to file herein a copy of all process and pleadings and a copy of all records and proceedings in the interpleader action.

A motion for summary judgment on behalf of the debtor and Deupree was withdrawn at a hearing in this proceeding on August 2, 1988.

Notwithstanding any inconsistency indicated by the foregoing statements, this proceeding was tried before the bankruptcy judge, without the intervention of a jury, on September 22, 1988, with full participation by all parties, including NCR, as intervenor; and, at the conclusion of the trial, the proceeding was taken under advisement for a final ruling by the Court, with leave to the parties to submit written briefs, which have been submitted and considered. For aught that appears, the register of the Circuit Court of Talladega County continues to hold said sum of $10,000.00, which is a res or a stake now subject to the exercise of jurisdiction by this Bankruptcy Court and which is claimed, separately, by the debtor and H. Const. NCR claims to have the right to a satisfaction from the interpled funds of the unpaid balance of a judgment against H. Const.

*Findings of Fact —*

From the evidence presented to the Court, the stipulations by the parties, and certain uncontradicted statements by counsel during the trial, as well as obvious assumptions from the posture or the manner in which this dispute was submitted to the bankruptcy court for a resolution, the bankruptcy jduge finds the facts as follows:

1. The bank has incurred attorney's fees of $786.50 by virtue of its interpleader action;

2. NCR is owed the sum of $5,473.62 by H. Const., as the unpaid balance of a judgment obtained by NCR in Civil Action No. CV86–PT–1782–E, in the United States District Court for the Northern District of Alabama, on January 14, 1987;

3. At the times involved in this litigation, Deupree was the vice president of the debtor, and Horton was president of H. Const.; and whatever dealings were had between the debtor and H. Const. (both corporations) were transacted by their respective officers, Deupree and Horton, with any exceptions not being reflected in the evidence;

4. Prior to any dealings between the debtor and H. Const., Deupree or the debtor (or both) had been involved with the construction or operation (or both) of an

Arby's restaurant at Sylacauga, Alabama, in the spring of 1985; and, not long thereafter, Deupree and Horton orally agreed that the debtor and H. Const. would undertake the construction of Arby's restaurants, with anticipated profits to be shared equally; and, pursuant to this agreement, the debtor and H. Const. built Arby's restaurants at Talladega, Alabama, Lexington, Kentucky, Gulfport, Mississippi, and Gulf Shores, Alabama, equally sharing profits from these joint ventures of $20,000 to $80,000;

5. In these projects, H. Const. engaged in the on-site construction work and related office work, and the debtor obtained a letter of credit, necessary for the awarding to H. Const. of the construction contracts and availability of construction financing, as well as seeing to the coordination of the construction work with the financing and other requirements for the carrying out of the construction work; and, under the same arrangements, H. Const. undertook the building of an Arby's restaurant at Millington, Tennessee, from which activity this litigation springs;

6. For the Millington job, H. Const. became indebted to NCR for the purchase of computer-type equipment installed in the Arby's restaurant there, and this debt is the foundation of NCR's judgment against H. Const.;

7. During or near the time of the Millington job, Horton and his wife, who was office manager of H. Const., were divorced, and Horton was obligated to pay her $10,000.00 in relation to the divorce;

8. Mrs. Horton, after the divorce, continued for some time in her capacity as officer manager of H. Const. and collected the $10,000.00 by making payable to herself an H. Const. bank check for that sum;

9. Prior to or at the beginning of the Millington job, Horton and Deupree furnished to the bank documents which authorized the bank to pay checks drawn on the checking account of H. Const. at the bank only upon the joint signatures of Horton and Deupree, and this bank account was used by H. Const. for handling transfers of funds related to the Millington job, and it was Horton's practice to leave with Deupree blank checks for this account which Horton had signed, with the understanding that Deupree would use the checks in connection with the management services furnished by the debtor in the construction venture;

10. The $10,000.00 check paid to Mrs. Horton was obtained by her on the basis that it would be a draw against H. Const.'s share of the anticipated profits from the Millington job, and there was no evidence that either Horton or H. Const. challenged her receiving these funds in that fashion;

11. Horton spent a good deal of his time away from Sylacauga, Alabama, where, apparently, the H. Const. office was located; and, after the middle of April, 1986, a problem had developed with the Millington job, in that the property owner had failed or refused to make anticipated payments to H. Const., under the construction contract; and shortly thereafter, while Horton was out of town and Mrs. Horton was still acting as manager of the H. Const. office, Deupree signed and made payable to the debtor one of the H. Const. checks (numbered 168) for the sum of $10,000.00, which Deupree claims was to match a draw for H. Const. against anticipated profits of a like amount, being the $10,000.00 obtained by Mrs. Horton;

12. The check payable to the debtor for $10,000.00 was endorsed for deposit in the debtor's name by Deupree and was deposited in a bank in Sylacauga, Alabama; but, before being transferred to and paid by the (Talladega) bank Mrs. Horton had informed Horton of the drawing of the check, during a telephone conversation with him, and Horton, in a telephone call to the bank, had advised the bank not to pay such a check payable to the debtor (no check number being mentioned);

13. During the telephone call to the bank, Horton was informed that payment of the check would be stopped but that this instruction would have to be confirmed by a written stop-payment order;

14. Horton complied with the bank's requirement for a written confirmation of the

stop-payment order but the writing named Deupree—not the debtor—as the payee of the check and did not contain a check number;

15. In connection with these events, the bank issued to H. Const. a written acknowledgment of a stop-payment order on April 24, 1986, for a $10,000 check, payable to Deupree, with an "oral" box checked but with a check-number box left blank;

16. H. Const. check number 168, dated "4-20-86," payable to the debtor in the sum of $10,000 was forwarded and presented to the bank, which, in regular course, photographed the check and entered a debit of $10,000 for it upon the the account maintained by the bank for H. Const.;

17. This debit was included in a debit to the account, on April 28, 1986, for five checks totalling $25,226.49; .

18. On April 24, 1986, the account shows a debit of $10, for a "stop payment fee," and on April 29, 1986, the account shows a "deposit" of $10,000;

19. On a statement of account, issued by the bank to H. Const. on its account, showing a closing date of April 30, 1986, the bank listed numerous "CHECKS PAID," including $10,000.00, check number 168, April 28;

20. The bank, however, did not pay the funds related to the check over to the debtor's forwarding bank, and, instead, returned the check to the debtor's bank, with the legend "PAYMENT STOPPED" stamped three times across the face of the check;

21. On May 8, 1986, Deupree wrote to the bank advising that he was awaiting a reply to a request made to Horton "to honor check no. 168 in the amount of $10,-000";

22. In the letter to the bank, Deupree requested that the bank withhold $10,000 until Horton's consent was obtained or, if not obtained, that the bank interplead the money in the state court;

23. Also, on May 8, 1986, Deupree wrote to Horton—sending a copy to the bank—and outlined his expectation that the $10,000 be paid, as a draw equal to that which Mrs. Horton had previously obtained;

24. When Horton's consent to payment of the check to the debtor was not forthcoming, the bank interpled the $10,000 in the state court, where the register holds these funds in an interest-bearing account; and

25. Following the bank's debit of $10,-000.00 to the H. Const. account for check number 168, payable to the debtor, Horton was permitted to cash, at an affiliated bank in a different city, a check on the H. Const. account, which, when other checks on the account were paid by the bank, overdrew the account by $3,022.00, a sum now due the bank on the H. Const. account after the bank interpled the $10,000.00.

*Conclusions by the Court —*

The evidence establishes two major ambiguties—one created by Horton and it followed by one on the part of the bank.

On, apparently April 24, 1986, Horton verbally directed the bank to stop payment on an H. Const. check for $10,000.00, *payable to the debtor.* He followed this with a written confirmation to the bank, but the writing varied from the oral order by naming Deupree as the payee of the check instead of the debtor. Adding to the uncertainty as to Horton's intentions was the absence from the instructions of a check number.

Upon the presentment to the bank of the check payable to the debtor for $10,000.00, the bank appears to have treated the check as if there were no stop-payment order applicable to it. Accordingly, on April 28, 1988, this check and four other checks were debited to the H. Const. account.

At this point the bank held a check signed by the two jointly-authorized signatories. The bank had been told by one of them not to pay the check but later was given a written confirmation which varied from the oral order by describing a check payable to Deupree instead of the debtor. On the other hand, the endorsement of the check in the debtor's name by Deupree signaled the bank that the other person jointly authorized to sign H. Const. checks

was instructing the bank to honor the check.

Having first debited the H. Const. account for payment of the check, the bank appears then to have undertaken to dishonor the check by stamping "PAYMENT STOPPED" three times across the face of the check and returning it and by withholding payment of the funds which the check purported to order to be paid to the debtor. Following the receipt of further indications that Deupree wanted the check paid and that Horton opposed payment, the bank interpled the sum of $10,000 in the state court.

Although, the H. Const. account reflects a "deposit" of $10,000.00 on April 29, 1986, the Court is not aware of any indication that this represented a reversal by the bank of the debit for the check on the preceding day.

NCR argues that the issuance of a bank check is not "an assignment of any funds in the hands of the drawee available for payment," but this is an argument against a much lesser proposition than the one raised by the debtor's position in this proceeding. The assertion by NCR appears to be what primary logic would teach, even if not codified in Code of Alabama, § 7–3–409(1) (1975, repl. vol. 1984)—which it is.

NCR, with some encouragement from Horton and H. Const., attempts to challenge the right of the debtor to a check for $10,000.00 on the H. Const. account, arguing that the Millington job had not reached a stage for there to exist any profits to be divided, in view of the owner's cessation of payments to H. Const. under the construction contract. The prior practice of H. Const. and the debtor—on other jobs—had been to make draws against anticipated profits. It may be inferred that Horton was virtually the alter ego of H. Const., if not so in fact. The evidence shows that a draw of $10,000.00 for the account of Horton (by his former wife) had already been made, and it was not at all established that the debtor was not thus entitled to a corresponding draw of $10,000.00.

Deupree makes no claim to the stake in this litigation but supports the claim of the debtor. The debtor contends that there was no stop-payment order as to the check payable to the debtor for $10,000.00—either oral or written. This contention, however, is contradicted by the bank's officer, who testified that Horton told him over the telephone that Deupree "had signed a check for ten thousand dollars to his company." [trial traspt. p. 66] Thus, there was in fact an oral order that correctly described the payee and the amount of the check but gave no date or check number. The debtor's more fundamental position in this controversy appears to be that there was no legally-effective stop-payment order on the check in question and that the bank was not warranted in withholding payment of the check. While not clearly set out, this position depends upon a conclusion that the written stop-payment order replaced the oral one and must be found legally deficient because it did not identify the check in question as to its date or number and misidentified the payee as being Deupree instead of the debtor.

█ The Court has no problem in accepting the debtor's conclusion that the written order to the bank superseded the oral order and must be taken as the controling one of the two. The written order followed the oral order and must be taken as the bank customer's then-current position as to a check which had not yet been presented for payment. Furthermore, the written order would be less conducive to a misstatement or a misunderstanding than an oral order and would justify more reliance upon it.

This conclusion does not advance this controversy to a decision as the debtor contends. Although controlling, what does the written order control? It controls liability between H. Const. and the bank for payment of the misdescribed check and would relieve the bank from liability to H. Const. for payment of the check.

The cases cited by the debtor deal with a bank's liability (or lack of liability) to its customer for paying a check in the face of a stop-payment order which misdescribes the check sought to be defeated. *See Sher-*

*rill v. Frank Morris, Etc.*, 366 So.2d 251 (Ala.1978). It is clearly established in the present case that, after Horton gave to the bank the sketchy and erroneous written stop-payment order, the bank would not have been liable to H. Const. had the bank paid the check over the counter. This sort of issue, of course, is not the same question presented when the check is misdescribed, the customer's account is debited, the check is listed on the customer's account as "paid," but the bank refuses to settle with a forwarding bank for the check. If the bank then freezes the funds, the dispute becomes a three-headed controversy involving the bank and its customer and the payee of the check. This, then, is not the usual check stop-payment case.

While this litigation does not pose any real question as to whether the issuance of a check amounts to an assignment of funds or credits available for payment of checks against the bank account identified in the check, the issue does appear to bear some kinship to an assignment question. The debtor's claim to funds in the H. Const. account was made to the bank at a time when the bank was not obliged to associate the stop-payment order with the check and had not in fact done so. One might suppose that this three-pronged claim to the interpled funds must be decided through some extrapolation by the Court of the rules of the law of assignments, because the parties cite no statutory precepts, save *Code of Alabama*, § 7–3–409, and that sets forth the earlier-stated basic rule that the issuance of a bank check does not amount to an assignment of funds credited by the bank to its customer's account. Yet, Article 4 of the Alabama *Uniform Commercial Code* is titled "Bank Deposits and Collections" and consists of some 37 sections—several with multiple parts.

The Court is not persuaded to the implication of the briefs filed herein that the Alabama accumulation of rules governing "Bank Deposits and Collections" does not provide rules for a decision in this dispute. For example § 7–4–403 states that an oral stop-payment order binds a bank for only 14 days and that a stop-payment order "must be received at such time and in such manner as to afford the bank a reasonable opportunity to act upon it prior to any action by the bank with respect to the 'item' described in section 7–4–303." Here, "item" means the check,[1] and the reference to § 7–4–303 relates to "action by the bank" in regard to the check. One of the actions by the bank, as described in subdivision (1)(d), is that the bank has "[c]ompleted the process of posting the item to the indicated account of the drawer." But these rules, although illuminating, appear to deal with the right of the bank to pay the item rather than with the payee's right to payment of the item in the face of a refusal to pay. In the present case, the bank was not bound by the ambiguous and sketchy stop-payment order, but still it did not pay over the proceeds of the check.

Turning, however, to § 7–4–213(1), we find that "[u]pon a final payment under subparagraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item." Paragraph (1) begins with the statement that "[a]n item is finally paid by a payor bank when the bank has done any of the" four acts there described, such as "(a) [p]aid the item in cash." Subparagraph (c) is: "[c]ompleted the process of posting the item to the indicated account of the drawer,...." Thus, if the *process* of posting the item has been completed, the item has been *finally paid* by the payor bank, and that bank is then *liable* for the amount of the item. If there is any lack of clarity as to whom the bank is liable, it would make no sense if the reference were to the drawer, and the bank's liability must be to the owner of the item or collecting bank or in an appropriate case to a prior endorser.

This conclusion is supported by the "Official Comment" to § 7–4–213(1), which explains the concept of "final payment:"

Final payment of an item is important for a number of reasons. It is one of several factors determining the relative priorities between items and notices,

---

1. Code of Alabama § 7–4–104(1)(g) (1975, repl. vol. 1984).

stop-orders, legal process and set-offs (Section 7-4-303). It is the "end of the line" in the collection process and the "turn around" point commencing the return flow of proceeds. It is the point at which many provisional settlements become final. See Section 7-4-213(2). Final payment of an item by the payor bank fixes preferential rights under Section 7-4-214(1) and (2).

2. If an item being collected moves through several states, e.g., is deposited for collection in California, moves through two or three California banks to the Federal Reserve Bank of San Francisco, to the Federal Reserve Bank of Boston, to a payor bank in Maine, the collection process involves the eastward journey of the item from California to Maine and the westward journey of the proceeds from Maine to California. Subsection (1) adopts the basic policy that final payment occurs at some point in the processing of the item by the payor bank. This policy recognizes that final payment does not take place, in such hypothetical case, on the journey of the item eastward. It also adopts the view that neither does final payment occur on the journey westward because what in fact is journeying westward are *proceeds* of the item. Because the true tests of final payment are the same in all cases .and to avoid the confusion resulting from variable standards, the rule basing final payment exclusively on action of the payor bank is not affected by whether payment is made by a remittance draft or whether such draft is itself paid.

▮ In this proceeding, the remaining question is whether the bank had "completed the process of posting the item to the indicated account of the drawer." The evidence shows that the bank entered a debit to the account of the drawer, H. Const., for $25,226.49, on April 28, 1986. This was the sum of the five checks—including number 168, for $10,000—shown on the drawer's bank statement to have been paid against the account on that date. If that action did complete "the process of posting the item to the indicated account," there is the further action of the bank in listing check

number 168 as being paid for $10,000 on April 28, 1986, in the listing of checks paid—shown on the drawer's account statement issued by the bank for the period ended April 30, 1986.

No detailed or reliable evidence of the posting *process* employed by the bank was presented, and there was no evidence that any further step by the bank was required to complete its process of posting the item to the H. Const. account, against which the check was drawn. At least as early as April 30, 1986, the bank had completed the process of "final payment" of the check payable to the debtor and had become "accountable" to it for the amount of the item, $10,000. The process of accounting by the bank was belatedly begun by the bank when it interpled the $10,000 in the state court and will be completed when the register pays over those funds to the debtor.

▮ The evidence indicates clearly that the bank's claim for an overdraft on the account arose after "final payment" of the check and that the bank has no counterclaim enforceable against the $10,000, now in the hands of the register. The bank's problems with the check arose because of its failure to make a seasonable final settlement of the check after final payment, and the Court is unable to find that it has any equitable right to satisfy its legal fees from the $10,000 and thereby shift to the debtor the bank's expense in disentangling itself from the results of its ambivalence. In the same vein, costs of this and the state court proceeding should be taxed to the bank.

The claim of NCR is an appendage to this interpleader proceeding. Its claim is only against H. Const. and may be asserted only against any funds here which belong to H. Const. There is none against which the claim may be levied. NCR, by its garnishment of the register (if that in fact occurred) and its intervention (if that in fact occurred), has been plumbing a dry well.

The question of liability of the bank to the debtor for interest on the $10,000 has not really been litigated in this proceeding,

and the Court will presently abstain from that matter. If it is a real source of controversy between the bank and the debtor, perhaps they can resolve it by some mutually-acceptable compromise. The Court will enter an order for the resolution of the other matters.

### JUDGMENT

In accordance with the Court's findings of fact and conclusions of law made in the above-styled adversary proceeding on the present day, it is ORDERED by the Court as follows:

1. It is adjudged that the debtor, Deupree Food Systems, Inc., owns and has the unfettered right to the sum of $10,000 (including any interest earned thereon) paid by First Alabama Bank to the register of the Circuit Court of Talladega County, Alabama, by way of interpleader in that court's civil action designated as CV–86–200076;

2. It is adjudged that none of the other parties to this adversary proceeding, which encompasses said interpleader action, has any right to, title to, or enforceable interest in said funds;

3. The register of the Circuit Court of Talladega County, Alabama, is authorized and directed to pay said funds to said debtor, Deupree Food Systems, Inc.;

4. The costs of this adversary proceeding and of said interpleader action in said State court are taxed to said First Alabama Bank;

5. All other claims or demands, except for any interest claimed by said debtor against First Alabama Bank, are denied and dismissed;

6. Unless an interest claim has been asserted by the debtor against First Alabama Bank through further pleadings filed herein by January 16, 1989, the clerk is authorized and directed to close this adversary proceeding, forthwith; and

7. The clerk shall mail a copy of this judgment and of said findings of fact and conclusions of law to each of the following by certified mail, return receipt requested: the register of the Circuit Court of Tallade-

ga County, Alabama; the bankruptcy administrator; and the respective attorneys of record for First Alabama Bank, James L. Deupree, Jr., Horton Construction Co., Inc., Michael L. Horton, and NCR Corporation, respectively.